J-S20020-18
J-S20021-18

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: L.E.B., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| APPEAL OF: F.E.K., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 1769 MDA 2017 |

Appeal from the Order Entered October 27, 2017
In the Court of Common Pleas of Cumberland County
Juvenile Division at No(s):  CP-21-DP-0000028-2016

| | | |
|---|---|---|
| IN THE INTEREST OF: L.E.B., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| APPEAL OF: F.E.K., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 1780 MDA 2017 |

Appeal from the Decree October 20, 2017
In the Court of Common Pleas of Cumberland County
Orphans' Court at No(s):  106 Adoptions 2017

BEFORE:  GANTMAN, P.J., OTT, J., and KUNSELMAN, J.

MEMORANDUM BY OTT, J.:                    **FILED APRIL 27, 2018**

F.E.K. ("Mother") appeals from the decree entered October 20, 2017,[1]

in the Court of Common Pleas of Cumberland County, which involuntarily

_____

[1] The trial court entered a separate decree that same day, terminating the parental rights of Child's father, A.E.B.  A.E.B. did not appeal the termination of his parental rights, nor did he file a brief in connection with the instant appeal.

terminated her parental rights to her minor daughter, L.E.B. ("Child"), born in September 2007. Mother also appeals from the order dated October 20, 2017, entered October 27, 2017, which changed Child's permanency goal from return to parent or guardian to adoption.[2] In addition, Mother's counsel has filed petitions to withdraw and briefs pursuant to **Anders v. California**, 386 U.S. 738 (1967), and **Commonwealth v. Santiago**, 978 A.2d 349 (Pa. 2009). After careful review, we grant counsel's petitions to withdraw and affirm the decree and order.

The record reveals that Cumberland County Children and Youth Services ("CYS") became involved with Child in January 2016, due to Mother's erratic behavior and failure to provide appropriate supervision. On January 16, 2016, Mother called for an ambulance, claiming that Child was sick. Master's Recommendation for Shelter Care (Findings/Orders), 2/16/2016, at 2. When the ambulance arrived, Mother required that the paramedics assess Child outside, and refused to let them into her home. **Id.** On January 29, 2016, police officers discovered Child alone at a Rent-A-Center. **Id.** The officers were initially unable to locate Mother and return Child to her care. **Id.** Finally, on February 2, 2016, police officers discovered Mother "attempting to flag

_____

[2] Because Mother's appeals arise from the same set of facts and involve similar issues, we have consolidated them for disposition.

down a car to drive her to Philadelphia."[3]  ***Id.***  A shelter care hearing took place before a master on February 4, 2016.  The trial court adopted the master's recommendation and entered a shelter care order on February 16, 2016.  The court adjudicated Child dependent on February 23, 2016.

On June 20, 2017, CYS filed a petition to change Child's permanency goal from return to parent or guardian to adoption.  On September 21, 2017, CYS filed a petition to involuntarily terminate Mother's parental rights to Child. The trial court conducted a combined goal change and termination hearing on October 20, 2017.[4]  That same day, the court entered a decree terminating Mother's parental rights.  However, the order changing Child's permanency goal was not entered on the docket until October 27, 2017.  Mother timely filed notices of appeal on November 17, 2017, along with concise statements of errors complained of on appeal.  In Mother's concise statements, her counsel indicated his intent to file petitions to withdraw and ***Anders*** briefs. Mother's counsel filed petitions to withdraw and ***Anders*** briefs in this Court on February 11, 2018.[5]

_____

[3] The date of Mother's attempt to hitchhike to Philadelphia is not included in the master's recommendation for shelter care, but appears in several pleadings throughout the record.  CYS also included a police report resulting from this incident as part of an exhibit during the goal change and termination hearing.

[4] Child had the benefit of both legal counsel and a guardian *ad litem* during the hearing.

[5] While Mother's counsel filed a separate petition to withdraw and ***Anders*** brief at each appeal, his filings are identical.

Before reaching the merits of Mother's appeal, we first must address counsel's petitions to withdraw. *See Commonwealth v. Rojas*, 874 A.2d 638, 639 (Pa. Super. 2005) ("'When faced with a purported *Anders* brief, this Court may not review the merits of the underlying issues without first passing on the request to withdraw.'") (quoting *Commonwealth v. Smith*, 700 A.2d 1301, 1303 (Pa. Super. 1997)).  This Court extended the *Anders* procedure to appeals from decrees involuntarily terminating parental rights in *In re V.E.*, 611 A.2d 1267 (Pa. Super. 1992).  To withdraw pursuant to *Anders*, counsel must:

> 1) petition the court for leave to withdraw stating that, after making a conscientious examination of the record, counsel has determined that the appeal would be frivolous; 2) furnish a copy of the [*Anders*] brief to the [appellant]; and 3) advise the [appellant] that he or she has the right to retain private counsel or raise additional arguments that the [appellant] deems worthy of the court's attention.

*Commonwealth v. Cartrette*, 83 A.3d 1030, 1032 (Pa. Super. 2013) (*en banc*) (citing *Commonwealth v. Lilley*, 978 A.2d 995, 997 (Pa. Super. 2009)).  With respect to the third requirement of *Anders*, that counsel inform the appellant of his or her rights in light of counsel's withdrawal, this Court has held that counsel must "attach to their petition to withdraw a copy of the letter sent to their client advising him or her of their rights." *Commonwealth v. Millisock*, 873 A.2d 748, 752 (Pa. Super. 2005).

Additionally, an *Anders* brief must comply with the following requirements:

(1) provide a summary of the procedural history and facts, with citations to the record;

(2) refer to anything in the record that counsel believes arguably supports the appeal;

(3) set forth counsel's conclusion that the appeal is frivolous; and

(4) state counsel's reasons for concluding that the appeal is frivolous. Counsel should articulate the relevant facts of record, controlling case law, and/or statutes on point that have led to the conclusion that the appeal is frivolous.

*Santiago*, 978 A.2d at 361.

In the instant matter, counsel filed petitions to withdraw, certifying that he reviewed the case and determined that Mother's appeal is frivolous. Counsel also filed briefs, which include a summary of the history and facts of the case, potential issues that could arguably support the appeal, and counsel's assessment of why those issues are meritless, with citations to the record and relevant legal authority. Counsel attached to his briefs a copy of his letter to Mother, advising her that she may obtain new counsel or raise additional issues *pro se*. Accordingly, counsel has complied with the requirements of *Anders* and *Santiago*, and we may proceed to review the issues outlined in his *Anders* briefs. We must also "conduct an independent review of the record to discern if there are any additional, non-frivolous issues overlooked by counsel." *Commonwealth v. Flowers*, 113 A.3d 1246, 1250 (Pa. Super. 2015) (footnote omitted).

Counsel's *Anders* briefs raise the following issues for our review.

1. Did the trial court abuse its discretion and commit an error of law when it found that the child's permanent placement goal of reunification was neither appropriate, nor feasible and ordered a goal change to adoption, thus contravening section 6351(f) of the Juvenile Act, 42 Pa.C.S.[A.] § 6351(f)?

2. Did the trial court abuse it discretion and commit an error of law when it found that sufficient grounds existed for a termination of [Mother's] parental rights in the child, thus contravening sections 2511(a) and 2511(b) of the Adoption Act, 23 Pa.C.S. §§ 2511(a) & 2511(b)?

***Anders*** briefs at 4 (suggested answers omitted).

We first consider whether the orphans' court abused its discretion by changing Child's permanency goal to adoption. We apply the following standard of review.

. . . [T]he standard of review in dependency cases requires an appellate court to accept the findings of fact and credibility determinations of the trial court if they are supported by the record, but does not require the appellate court to accept the lower court's inferences or conclusions of law. Accordingly, we review for an abuse of discretion.

***In re R.J.T.***, 9 A.3d 1179, 1190 (Pa. 2010).

The Juvenile Act governs proceedings to change a child's permanency goal. ***See*** 42 Pa.C.S.A. §§ 6301-6375. Trial courts must apply the following analysis when considering a goal change petition.

Pursuant to [42 Pa.C.S.A.] § 6351(f) of the Juvenile Act, when considering a petition for a goal change for a dependent child, the juvenile court is to consider, *inter alia:* (1) the continuing necessity for and appropriateness of the placement; (2) the extent of compliance with the family service plan; (3) the extent of progress made towards alleviating the circumstances which necessitated the original placement; (4) the appropriateness and feasibility of the current placement goal for the children; (5) a likely date by which the goal for the child might

- 6 -

be achieved; (6) the child's safety; and (7) whether the child has been in placement for at least fifteen of the last twenty-two months. The best interests of the child, and not the interests of the parent, must guide the trial court. As this Court has held, a child's life simply cannot be put on hold in the hope that the parent will summon the ability to handle the responsibilities of parenting.

*In re A.B.*, 19 A.3d 1084, 1088-89 (Pa. Super. 2011) (citations and quotation marks omitted).

In this case, the trial court found that Child has been in placement for twenty months, and that Mother remains unable to provide the care necessary for her mental and emotional well-being.[6] Trial Court Opinion, 1/12/2018, at 4. The court emphasized that Child is afraid of Mother, despite intensive therapy. *Id.* In addition, the court found that little, if any, bond exists between Child and Mother. *Id.* at 5. The court found that Child has a bond with her pre-adoptive foster parents, and that the love and support of the foster parents will enable Child to overcome any adverse effects resulting from the severance of her relationship with Mother. *Id.*

Mother argues that the trial court abused its discretion and committed an error of law, because she complied with her Family Service Plan (FSP) goals. *Anders* briefs at 12. Mother contends that she obtained mental health treatment, participated in parenting instruction, and visited Child. *Id.* Mother

---

[6] In its opinion, the trial court focused its analysis on its decision to terminate Mother's parental rights. While the court did not separately discuss its decision to change Child's permanency goal to adoption, we find that its analysis of the evidence supporting termination also supports the goal change.

further argues that the court failed to consider whether CYS made reasonable efforts to finalize Child's permanency plan pursuant to 42 Pa.C.S.A. § 6351(f)(5.1). *Id.* Mother contends that she is a Muslim, but that CYS placed Child in a Christian foster home. *Id.* Mother maintains that placing Child in a Christian foster home alienated her from her religious and cultural roots, and impaired Mother's ability to establish a bond. *Id.* at 12-13.

After a thorough review of the record in this matter, we conclude that the trial court did not abuse its discretion. During the hearing, CYS presented the testimony of caseworker, Debra Zervanos. Ms. Zervanos testified that Mother is compliant with her FSP goals. N.T., 10/20/2017, at 46, 48. Mother attends parenting instruction and mental health counseling, and participates in visits with Child. *Id.* at 48-49. However, Ms. Zervanos testified that Child should not return to Mother's care, because she is afraid of Mother and has no bond with her. *Id.* at 49. She explained, "She was getting herself so anxious prior to visits she wasn't sleeping. She was waking up with night terrors. There was one incident following a visit where she urinated herself." *Id.* at 50-51. Child receives therapy in order to address these issues. *Id.* at 51.

CYS also presented the testimony of Mother's parenting instructor and visitation supervisor, Lee Marriot, of Alternative Behavior Consultants. Ms. Marriot testified that Mother did not progress in her parenting instruction, due to her failure to interact with Child during visits. *Id.* at 33. Ms. Marriot

recalled that she would often need to prompt Mother in order for her to speak to Child. *Id.* at 34-35. She explained, "[f]or a two-hour visit, there was less than twelve minutes, less than ten minutes, less than eight minutes of conversation . . . . It was common to have ten, fifteen, twenty, twenty-five minute periods of silence . . . ." *Id.* at 35, 78. Ms. Marriot described a typical visit at Mother's home as follows.

> Typically, mom would be on the couch and unengaged and rocking and looking at the television and [Child] would be carrying on a conversation with me and wanting to play with her dolls or do her homework, take long periods of time to get all of her homework done so that she could avoid interacting. That's what I typically saw for a long time.
>
> ***
>
> . . . . Mom was always happy to see [Child] and always greeted her in a happy way. [Child] would rush past her, not wanting to be hugged or kissed, and she usually had something good cooking and [Child] would say, ["]What did you make[?"]
>
> [Child] would do her homework with [the television program] Ellen on. It was hard for [Mother] to understand homework, so she would ask me for assistance with it. They would eat a meal together quietly and then [Child] would get some toys out to play with. That was like a typical type of visit.

*Id.* at 42-43.

In addition, CYS presented the testimony of Noretta Kime, Psy.D. clinical psychology.[7] Dr. Kime testified that she conducted an evaluation of Child's

---

[7] We take the spelling of Dr. Kime's last name from her bonding evaluation report. It is misspelled "Keim" in the transcript of the goal change and termination hearing.

bond with her foster mother, D.W., and with Mother. *Id.* at 6. She concluded that Child has a parental bond with D.W., and that removing Child from her care would be "very detrimental." *Id.* at 6-7. She concluded that Child has only a tenuous bond with Mother. *Id.* The trial court questioned Dr. Kime as follows.

> THE COURT: And what about if I would sever the relationship between [Child] and her mom? How would that affect her well-being?
>
> [Dr. Kime]: Based upon what I've been able to observe at the interview and evaluation and understanding bonding, it would be much less than it would be to sever that parental kind of relationship that [Child] has with [D.W.] that she has developed over this time.
>
> THE COURT: You say it would be much less, but you can't say that there would be no effect?
>
> [Dr. Kime]: I can't say there wouldn't be no effect, [*sic*] but it would be much, much greater and more detrimental to her well-being to sever that relationship between [Child] and [D.W.] because she's, [D.W.] is the parental figure in her life.
>
> THE COURT: Any detrimental effect suffered by [Child] in terminating the bond with her mother, would she be able to overcome that with the assistance of [D.W.]?
>
> [Dr. Kime]: Yes, I do believe so.

*Id.* at 7.

Thus, the record confirms that it would be in Child's best interest to change her permanency goal from reunification to adoption. Child's primary bond is with her pre-adoptive foster mother, D.W., and removing Child from D.W.'s care would be very detrimental for her. While Mother is compliant with

her FSP goals, she fails to engage and interact with Child during visits. Moreover, Child is fearful of Mother, and visiting with Mother causes Child significant emotional distress. Child's bond with Mother is tenuous, and severing that bond would not cause Child irreparable harm.

In reaching this conclusion, we reject Mother's claim that CYS impaired her ability to establish a bond by placing Child in a Christian foster home. The record reveals that Mother alone is responsible for her and Child's strained relationship. As discussed above, Mother often goes for anywhere from ten to twenty-five minutes during visits without even attempting to speak with Child.

Accordingly, our independent review of Mother's claim demonstrates that it does not entitle her to relief. Moreover, our review of the record does not reveal any non-frivolous issues overlooked by counsel. *See Flowers*, 113 A.3d at 1250. We therefore grant counsel's petition to withdraw as to the goal change, and we affirm the trial court's order.

We next consider whether the trial court abused its discretion by terminating Mother's parental rights to Child involuntarily. We do so mindful of the following.

> The standard of review in termination of parental rights cases requires appellate courts to accept the findings of fact and credibility determinations of the trial court if they are supported by the record. If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion. A decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will. The trial

court's decision, however, should not be reversed merely because the record would support a different result. We have previously emphasized our deference to trial courts that often have first-hand observations of the parties spanning multiple hearings.

*In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013) (citations and quotation marks omitted).

Termination of parental rights is governed by Section 2511 of the Adoption Act, 23 Pa.C.S.A. §§ 2101-2938, which requires a bifurcated analysis.

Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child. One major aspect of the needs and welfare analysis concerns the nature and status of the emotional bond between parent and child, with close attention paid to the effect on the child of permanently severing any such bond.

*In re L.M.*, 923 A.2d 505, 511 (Pa. Super. 2007) (citations omitted).

In this case, the trial court terminated Mother's parental rights pursuant to Sections 2511(a)(1), (2), (5), (8), and (b). We need only agree with the court as to any one subsection of Section 2511(a), as well as Section 2511(b), in order to affirm. *In re B.L.W.*, 843 A.2d 380, 384 (Pa. Super. 2004) (*en banc*), *appeal denied*, 863 A.2d 1141 (Pa. 2004). Here, we analyze the court's decision to terminate under Section 2511(a)(2) and (b), which provides as follows.

**(a) General rule.--**The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

\*\*\*

(2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.

\*\*\*

**(b) Other considerations.--**The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S.A. § 2511(a)(2), (b).

We first address whether the trial court abused its discretion by terminating Mother's parental rights pursuant to Section 2511(a)(2).

In order to terminate parental rights pursuant to 23 Pa.C.S.A. § 2511(a)(2), the following three elements must be met: (1) repeated and continued incapacity, abuse, neglect or refusal; (2) such incapacity, abuse, neglect or refusal has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being; and (3) the causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied.

*In re Adoption of M.E.P.*, 825 A.2d 1266, 1272 (Pa. Super. 2003) (citation omitted). "The grounds for termination due to parental incapacity that cannot be remedied are not limited to affirmative misconduct. To the contrary, those grounds may include acts of refusal as well as incapacity to perform parental duties." *In re A.L.D.*, 797 A.2d 326, 337 (Pa. Super. 2002) (citations omitted).

Instantly, Mother argues that the trial court abused its discretion because she complied with her FSP goals and did everything that CYS asked her to do. *Anders* briefs at 14. Mother further argues that the court disregarded her attempts to bond with Child, as well as Child's "stubborn resistance to [M]other's patient efforts toward engagement." *Id.*

We conclude that Mother is not entitled to relief. After thorough review of the testimony of caseworker, Debra Zervanos; parenting instructor and visitation supervisor, Lee Marriot, of Alternative Behavioral Consultants; and psychologist, Noretta Kime, Psy.D. clinical psychology; as discussed previously, we find the record supports the trial court's finding that Mother is incapable of parenting Child, and that Mother cannot or will not remedy her parental incapacity. Mother rarely interacts with Child unless Ms. Marriot prompts her to do so. Moreover, Mother has failed to develop a bond with Child, and Child is now fearful of her. By the time of the termination hearing in this matter, Child had been in placement for twenty months. Child is in need of permanence and stability, and it is clear that Mother will not be able

to provide her with either within a reasonable time. As this Court has stated, "a child's life cannot be held in abeyance while a parent attempts to attain the maturity necessary to assume parenting responsibilities. The court cannot and will not subordinate indefinitely a child's need for permanence and stability to a parent's claims of progress and hope for the future." ***In re Adoption of R.J.S.***, 901 A.2d 502, 513 (Pa. Super. 2006).

Finally, we consider whether the trial court abused its discretion by terminating Mother's parental rights pursuant to Section 2511(b).

> Section 2511(b) focuses on whether termination of parental rights would best serve the developmental, physical, and emotional needs and welfare of the child. As this Court has explained, Section 2511(b) does not explicitly require a bonding analysis and the term 'bond' is not defined in the Adoption Act. Case law, however, provides that analysis of the emotional bond, if any, between parent and child is a factor to be considered as part of our analysis. While a parent's emotional bond with his or her child is a major aspect of the subsection 2511(b) best-interest analysis, it is nonetheless only one of many factors to be considered by the court when determining what is in the best interest of the child.
>
>> [I]n addition to a bond examination, the trial court can equally emphasize the safety needs of the child, and should also consider the intangibles, such as the love, comfort, security, and stability the child might have with the foster parent. Additionally, this Court stated that the trial court should consider the importance of continuity of relationships and whether any existing parent-child bond can be severed without detrimental effects on the child.

***In re Adoption of C.D.R.***, 111 A.3d 1212, 1219 (Pa. Super. 2015) (quoting ***In re N.A.M.***, 33 A.3d 95, 103 (Pa. Super. 2011) (quotation marks and citations omitted).

Here, Mother argues that placing Child in a Christian foster home will have a lifelong detrimental effect on her, by alienating her from her religious and cultural roots. *Anders* briefs at 15. Mother refers this Court to the testimony of Imam Mahmoud F. Jawhar, who testified as an expert witness on "the practice of Islamic culture in Islamic families." N.T., 10/20/2017, at 20. He testified that placing a Muslim child in a non-Muslim foster home would reduce the likelihood that the child goes on to be a practicing Muslim later in life, and may leave them confused about their religious identity. *Id.* at 25-31.

Mother is not entitled to relief. As discussed during our analysis of the trial court's goal change order, Noretta Kime, Psy.D. clinical psychology, conducted a bonding evaluation of Child and Mother. Dr. Kime observed that CYS attempted to promote Child's bond with Mother, by providing her with assistance from Lee Marriot and Alternative Behavior Consultants. N.T., 10/20/2017, at 13. Despite this assistance, Dr. Kime concluded that Child has only a tenuous bond with Mother, and that severing that bond would have little, if any, effect. *Id.* at 6-7. Dr. Kime further concluded that Child has a parental bond with her foster mother, D.W., and that removing Child from D.W.'s care would be very detrimental for her. *Id.* Thus, it is clear that terminating Mother's parental rights would best serve Child's needs and welfare.

Additionally, the record belies Mother's argument that Child will suffer adverse religious or cultural consequences. Dr. Kime testified that Mother "didn't really speak about any kind of religious practices" during her bonding evaluation. N.T., 10/20/2017, at 9. Similarly, Ms. Marriot testified that she never observed Mother engage in any religious practices with Child during their visits. *Id.* at 41. Mother would sometimes pray during visits, but would do so alone in her bedroom, and would not ask Child to join her. *Id.* D.W. testified that she attempted to accommodate Child's religious background by offering her the opportunity to attend a mosque. *Id.* at 59. Child did not want to attend. *Id.*

Once again, our independent review of Mother's claim demonstrates that it does not entitle her to relief. Moreover, our review of the record does not reveal any non-frivolous issues overlooked by counsel. *See Flowers*, 113 A.3d at 1250. We therefore grant counsel's petition to withdraw as to the termination of parental rights, and we affirm trial court's order and decree.

Order affirmed. Decree affirmed. Petitions to withdraw granted.

Judge Kunselman joins in this decision.

President Judge Gantman concurs in the result.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 04/27/18